IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW STEDMAN, | ) | CASE NO. 1:05 CV 02051 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE GAUGHAN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE HEMANN |
| EDWIN VOORHIES, Warden, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2(b)(2).  Before the court is Matthew Stedman's ("Stedman") petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on August 24, 2005.  Stedman is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to a conviction for aggravated murder with a firearm specification in the case of *State v. Stedman,*  Case No. CR345782 (Cuyahoga County 1999).  Also before the court are Stedman's  motion for an evidentiary hearing (Docket #38) and motion for an expansion of the record (Docket #39).  For the reasons set forth below the magistrate judge recommends that the court overrule Stedman's motions and deny his petition.

I

The state appellate court reviewing Stedman's conviction described the following facts as relevant to the case:

At approximately one o'clock in the morning of February 5, 1994, on East 83rd Street in Cleveland, Shareece Scott, an alleged prostitute, was shot in the face and

killed as she leaned into the passenger side window of a small grey car which had pulled to the curb. Her last words, "What's up, baby?", preceded the fatal gunshot. The murder remained unsolved for more than two years.

In June 1995, Stedman fled when ATF agents arrived at his home to question him on unrelated charges in connection with manufacturing of automatic weapons. At that time, Stedman and Ciobotaru also had been indicted for a separate arson charge.

In November 1996, Alcohol, Tobacco, and Firearms (ATF) agents arrested Andrew Starr in connection with unrelated federal weapon charges. In exchange for leniency in his case, Starr told federal agents that Matthew Stedman had killed Scott, and he agreed to testify against Stedman at trial. In addition, Starr provided investigators with the names George "George C" Ciobotaru and James "JJ" Potasiewicz ["Potasiewicz" or "JJ"] whom he said would corroborate his statement. When questioned, Potasiewicz revealed that he was with Stedman at the time of the shooting, and he saw Stedman shoot Scott; separately, Ciobotaru told authorities that Stedman admitted shooting Scott.

On December 10, 1996, the grand jury indicted Potasiewicz and Stedman for the aggravated murder of Scott. The prosecutor nolled the charges against Potasiewicz shortly thereafter, based on his agreement to testify against Stedman.

In June of 1999, members of the Federal Bureau of Investigation and the Cleveland Homicide Unit located Stedman in Bangkok, Thailand, where he had been living for four years as Duncan Allen Robert Smith. They then extradited him back to the United States to stand trial for Scott's murder.

The court conducted a jury trial in this matter. The state presented Starr, who testified that Stedman told him that he shot a prostitute while he and Potasiewicz were driving around together late in the evening near the Cleveland Clinic; and that he shot her after she said "What's up baby."

In its case-in-chief, the state also presented Ciobotaru, who testified that he had given a statement, on November 22, 1996, to FBI Agent Philip Torsney and Cleveland Police Detective Gary Garisek which incriminated Stedman. At trial, when he testified that he did not recall if it was Stedman himself who told him about the shooting, the court, upon the state's request, declared him to be a hostile witness. The court subsequently interrupted his testimony when he stated that he felt coerced by the police into making the statement against Stedman. Out of the hearing of the jury, the court admonished him for recanting his prior statements. Despite the court's warning, however, when his testimony resumed at trial, Ciobotaru maintained that his statement had been coerced.

The state also called Potasiewicz, who testified that on February 5, 1994, he

2

had been out drinking with Stedman, and that after leaving the Flats, he rode in the passenger seat of the car driven by Stedman.  While driving down a side street on Cleveland's east side, they saw a female walking across the street. Stedman slowed down the car, told Potasiewicz to roll down the passenger side window, reached over, opened the glove compartment and pulled out a gun.  The female crossed the street and walked up to the passenger side window.  Stedman stopped the car as she leaned into the window and said, "What's up, baby," to which Stedman responded "nothing" and instantaneously shot her in the face at close range and drove off.

Finally, the state called Robert Nemeth ["Nemeth"], who testified that, in 1993 and 1994, he, Ciobotaru, and Stedman would go out drinking in the Flats and afterwards would drive around the area of East 40th and Cedar Avenue to harass prostitutes.  He testified that, in that area, if you stopped a car, a prostitute would approach you; he also testified that they harassed prostitutes by driving away as they approached.

Following trial, the jury returned a verdict finding Stedman guilty of the aggravated murder of Shareece Scott and the court imposed a life sentence.

*State v. Stedman*, 2001 WL 1398469, at *1-2 (Ohio App. Nov. 1, 2001) (punctuation in the original).  At the close of the state's case, Stedman moved for a new trial, and the court denied his motion.

Stedman, represented by counsel, filed a timely notice of appeal of his conviction. He raised three assignments of error in his appellate brief:

First Assignment of Error
The trial court erred by allowing a state witness to bolster his credibility through the use of hearsay.

Second Assignment of Error
The trial court erred and prejudiced the appellant when it improperly instructed and reprimanded a witness.

Third Assignment of Error
The trial court erred when it allowed the state to call a witness in violation of the rules of discovery.

(Spacing altered from the original.)  On October 31, 2000 Stedman filed *pro se* a motion to supplement his appellate brief by adding five additional assignments of error:

Fourth Assignment of Error
Failure of defense attorney, prior to trial to object or attempt to suppress, any testimony or evidence concerning the defendant's place of arrest and use of an alias.

Fifth Assignment of Error
Failure of defense attorney to object to prejudicial testimony concerning a past criminal act that was wholly independent of and with [sic] murder trial.

Sixth Assignment of Error
Failure of defense attorney to provide forensics expert to contradict State witnesses and to support defense theory.

Seventh Assignment of Error
Prosecution's use of State witnesses to illicit [sic] prejudicial testimony concerning an unrelated prior criminal act of defendant.

Eighth Assignment of Error
Prosecution's closing argument statement of additional evidence that could be explained after trial.

The state appellate court affirmed Stedman's conviction on November 13, 2001.

Stedman filed *pro se* a notice of appeal in the Ohio Supreme Court on December 13, 2001.  In his memorandum in support of jurisdiction, he asserted the following three propositions of law:

Proposition of Law No. 1

A defendant's constitutional guarantees under the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution are violated where a trial court, after requested, fails to make an admissibility determination on flight evidence, used to prove guilt of the crime charged, when several factors exist that would have caused the evidence to be inadmissible under the four prong test established in U.S. v. Myers, 550 F.2d 1036.

Proposition of Law No. 2

A defendant's constitutional guarantees under the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution are violated when a trial court errs by allowing the State to call a witness in violation of the rules of discovery, to testify to inadmissible "other

acts" evidence, then fails to give defense adequate time to prepare.

Proposition of Law No. 3

A defendant's constitutional guarantees under the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution are violated when a trial court permits witnesses to testify to hearsay within hearsay, wrongfully reprimands [a] witness, and then the State uses said testimony, and the court's biased attitude to bolster its case.

(Punctuation in the original.)  On December 28, 2001 Stedman filed through counsel a second memorandum in support of jurisdiction in which he asserted the following five propositions of law:

Proposition of Law I:

A witness may not vouch for his or her credibility regarding a statement made to that witness by a defendant by stating that the defendant made a similar statement to another person.

Proposition of Law II:

A trial judge may not threaten a witness to testify in conformity with an earlier statement.  Such action violates the court's goal of maintaining neutrality.

Proposition of Law III:

The failure of a party to provide the opposing party with a witness as required by the Rule of Criminal Procedure 16 is wilful where the failure is due to negligent trial preparation.

Proposition of Law IV:

The failure of trial counsel to timely object to an improper "flight" instruction denies a defendant his right to effective assistance of counsel.

Proposition of Law V:

The prosecutor may not urge the jury to convict based upon matters outside the evidence.

Stedman moved to dismiss counsel and strike the memorandum in support of jurisdiction

5

filed by his counsel.  On March 4, 2002 the Ohio Supreme Court denied both of Stedman's motions, denied him leave to appeal, and dismissed his appeal as not involving any substantial constitutional question.

On January 23, 2002 Stedman filed *pro se* in the state appellate court an application for reopening his appeal pursuant to Ohio App. R. 26(B).  In his brief in support of his application Stedman asserted that he had been denied effective assistance of appellate counsel because appellate counsel had failed to raise on appeal the trial court's designation of a state witness as a hostile witness, the prosecution's comments on Stedman's refusal to testify on his own behalf and the failure of the court to give a curative instruction following those comments, and the use of the uncorroborated testimony of an alleged co-defendant to convict Stedman.  On August 16, 2002 the state court denied Stedman's application on the grounds of *res judicata*, noting that under Ohio law an appellant could not reopen an appeal when the appellant had filed an appellate brief *pro se*.  Stedman did not appeal the appellate court's decision to the Ohio Supreme Court.

While his direct appeal was pending Stedman filed on November 21, 2000 in the trial court a petition for post-conviction relief pursuant to Ohio Rev. Code § 2953.21.  Stedman raised three grounds for relief in his petition:

GROUND FOR RELIEF 1

Defense counsel was ineffective where he failed to investigate by consulting with a forensic expert or having the said expert testify at trial.

GROUND FOR RELIEF 2

Defense counsel was ineffective where he denied the defendant the right to testify.

GROUND FOR RELIEF 3

Defense counsel was ineffective where he failed to subpoena or acquire crucial documents for evidence, failed to interview a known potential witness and made little or no investigation into the case.

The state moved to dismiss Stedman's petition on December 26, 2000.  On March 21, 2003 Stedman moved to compel the court to respond to his petition.  The court issued findings of fact and conclusions of law on September 15, 2003, finding that Stedman's petition was untimely, that his grounds for relief were barred by *res judicata*, and that they were without merit.

On September 30, 2003 Stedman filed in the state court of appeals a notice of appeal of the trial court's denial of his petition for post-conviction relief.  In his brief in support of his appeal, Stedman asserted four assignments of error:

Assignment of Error I

The trial court erred when it dismissed Appellant's post-conviction petition on the premise that it was untimely.

Assignment of Error II

The trial court erred when it denied Appellant's petition for post-conviction relief on the premise that it was res judicata.

Assignment of Error III

It was error for the trial court not to grant Appellant's motion for the appointment of an expert and hold an evidentiary hearing, as scientific facts were alleged, that if proven correct, would have placed grave doubt upon the verdict of the proceedings.

Assignment of Error IV

Counsel was ineffective for failing to consult with and provide a forensic expert at trial.

On July 6, 2004 the state appellate court found that Stedman's petition was not untimely

7

and that his ground for relief alleging that counsel was ineffective for failing to consult with and provide a forensic expert at trial was not barred by *res judicata*.  The appellate court did not overrule the trial court's judgment that Stedman's other grounds for relief were barred by *res judicata*, and it also held that the trial court did not err in failing to appoint an expert or hold an evidentiary hearing.  The court further found that because Stedman had failed to show how he was prejudiced by his trial counsel's allegedly ineffective performance and because counsel's performance did not fall below an objective standard of reasonableness, his claim of ineffective assistance of trial counsel was without merit.  For these reasons the state appellate court affirmed the judgment of the trial  court in denying Stedman's petition for post-conviction relief.

On July 2, 2004 Stedman filed a notice of appeal in the Ohio Supreme Court.  In his memorandum in support of jurisdiction, Stedman raised three propositions of law:

Proposition of Law No. 1

It is prejudicial error for a trial court to deny a postconviction petitioner's request for expert assistance when an expert is necessary to fully and fairly present a claim.

Proposition of Law No. 2

A reviewing court commits prejudicial error by denying a request for an evidentiary hearing, when certain operable facts are presented, that if proven correct, would require a reversal of conviction.

Proposition of Law No. 3

An attorney has an obligation to make reasonable investigations and, when necessary, consult with and present at trial, any expert that may be essential in securing their client's freedom.

(Punctuation in the original.)  On October 13, 2004 the Ohio Supreme Court declined jurisdiction and dismissed Stedman's appeal as not involving any substantial constitutional

8

question.

On April 21, 2005 Stedman filed in the trial court a request for an order that he was unavoidably prevented from discovering evidence substantiating a claim of actual innocence.  The evidence to which Stedman referred consisted of documents allegedly showing that he was out of this country when the murder of which he was convicted occurred.  On November 10, 2005 Stedman filed in the trial court a delayed motion for a new trial, asserting that newly discovered evidence substantiated a claim that he was out of the country at the time of the murder.  In support of his motion, Stedman provided documents tending to show that he was out of the country during the early and middle parts of 1994.  Both the request for a court order and the motion for a new trial are pending in state court.

Stedman filed a petition for a federal writ of habeas corpus in this court on August 24, 2005.  In his petition Stedman asserts six grounds for relief:

FIRST CLAIM FOR RELIEF

(Confrontation violation)

The trial court erred by overruling the objection to a hearsay statement elicited to corroborate testimony of a key prosecution witness. . . .

SECOND CLAIM FOR RELIEF

(Judicial misconduct)

A trial judge may not threaten a witness to testify in conformity with an earlier statement.  Such action violates the court's goal of maintaining neutrality. . . .

9

THIRD CLAIM FOR RELIEF

(State's Discovery Violations)

The court allowed the state to call Robert Nemeth as a state's witness.  The witness was not included on the state's witness list. . . . The failure of the state to comply with Crim.R. 16(B)(1)(e), which requires the disclose [sic] of witness names and addresses, prejudiced the Petitioner. . . . This rule is based upon United States Supreme Court case law which states that a criminal defendant is entitled to disclosure by the prosecution of all exculpatory evidence. . . . .

FOURTH CLAIM FOR RELIEF

(IAC-Flight Instruction Based on Inadmissible Evidence)

The failure of trial counsel to timely object to an improper "flight" instruction denies a defendant his right to effective assistance of counsel. . . .

FIFTH CLAIM FOR RELIEF

(Misconduct of Prosecutor)

The prosecutor may not urge the jury to convict based upon matters outside of the evidence. . . .

SIXTH CLAIM FOR RELIEF

(IAC-Failure to Prepare for Trial)

. . . Counsel failed to prepare for trial by making a reasonable investigation of the police statement made by the state's star witness, James Potasiewicz. . . . [C]ounsel's failure to investigate the scientific aspects of this witness's claims was by any standard unreasonable . . . .

Respondent filed an Answer/Return of Writ on February 17, 2006 (Docket #14).

On November 10, 2005 Stedman filed in the trial court a delayed motion for a new trial.  He based his motion on documents which he asserts were recently discovered and show that he was out of the country at the time of the murder of Sharee Scott.  On March

10

8, 2006 Stedman moved for an indefinite stay of consideration of his petition for a federal writ of habeas corpus pending resolution of his state request for a court order and motion for a new trial or, in the alternative, dismissal of his habeas petition while tolling the statute of limitations until Stedman exhausts state remedies.  On October 4, 2006 the court overruled Stedman's motion.

Stedman filed a traverse on November 17, 2006 (Docket #37).  Thus, the petition is ready for decision.

II

A.    *Jurisdiction*

Writs of habeas corpus may be granted by a district court within its respective jurisdiction:

> Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application.

28 U.S.C. § 2241(a) and (d).  Title 28 U.S.C. § 2254(a) provides in relevant part, "[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  This court has jurisdiction over Stedman's claims.

B.    *Evidentiary hearing*

The habeas corpus statute authorizes an evidentiary hearing in limited circumstances when the factual basis of a claim has not been adequately developed in

11

state court proceedings.  28 U.S.C. § 2254(e)(2).  There is no need for an evidentiary hearing in the instant case.  All Stedman's claims involve legal issues which can be independently resolved without additional factual inquiry.

Stedman argues in support of his motion for an evidentiary hearing that his defense counsel was ineffective for failing to secure at trial expert testimony to support the defense's theories of how the murder of Scott occurred and to contradict the testimony of Potasiewicz.  His argument depends upon the assumption that his trial counsel, indeed, was ineffective for failing to secure such testimony.  As is shown later, *see infra* at 41-44, trial counsel was not ineffective in this respect.  For this reason and because all factual issues raised by Stedman's petition can be resolved on the pleadings, the magistrate judge recommends that the court overrule Stedman's motion for an evidentiary hearing.

Stedman also moves to expand the record pursuant to Rule 8(a), Rules Governing Section 2254.  Stedman seeks to include evidence that he alleges would tend to show that Potasiewicz lied in his description of how the murder took place.  In particular, Stedman alleges that certain affidavits, sworn trial testimony from a forensic-ballistic expert, crime scene drawings, diagrams, treatises, and scientific texts would show that if Stedman had fired a pistol in front of Potasiewicz's face as Potasiewicz testified, his face would have been visibly burned by discharge exiting from the side of the pistol.  Stedman notes that no witness at trial testified that Potasiewicz  ever came home with visible burns to his eyes, face, or hair, thus undermining Potasiewicz's testimony.

The Advisory Committee notes accompanying the 1976 adoption of the rule state that the purpose of the rule "is to enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary

12

hearing."  The rule is not intended to allow a petitioner to re-try a conviction.  As has already been noted, all factual issues raised by Stedman's petition can be resolved on the pleadings.[1]  For this reason the magistrate judge recommends that the court overrule Stedman's motion to expand the record.

C.    *Exhaustion of state remedies*

A state prisoner must exhaust all available state remedies or have no remaining state remedies available prior to seeking review of a conviction via federal habeas corpus. 28 U.S.C. § 2254(b) and (c); *Castillo v. Peoples*, 489 U.S. 346, 349 (1989); *Riggins v. Macklin*, 936 F.2d 790, 793 (6th Cir. 1991).  If any state procedures for relief remain available, the petitioner has not exhausted state remedies.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

A petitioner must fairly present any claims to the state courts in a constitutional context properly to exhaust state remedies.  *Anderson v. Harless*, 489 U.S. 4 (1982); *Picard v. Connor*, 404 U.S. 270 (1971); *Shoultes v. Laidlaw*, 886 F.2d 114, 117 (6th Cir. 1989).  Federal courts lack jurisdiction to consider any claim that was not fairly presented to the state courts.  *Newton v. Million,* 349 F.3d 873, 877 (6th Cir. 2003).  "[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied."  *Picard*, 404 U.S. at 275; *see also Harris v. Reeves*, 794 F.2d 1168, 1174 (6th

---

[1]  In any case, Stedman's argument and evidence have serious flaws.  Although Stedman advances evidence (much of it not properly supported by an affidavit made on *personal* knowledge and, therefore, inadmissible) tending to show that pistols when fired generally discharge particles from the side for up to three feet, he does not provide evidence to show that these particles cause visible burns.  Thus, his assertion that no one testified that Potasiewicz ever came home with visible burns to his eyes, face, or hair is irrelevant.

13

Cir. 1986).  The exhaustion requirement is properly satisfied when the highest court in the state in which petitioner was convicted has been given a full and fair opportunity to rule on all of the petitioner's claims. *Manning v. Alexander*, 912 F.2d 878, 881-83 (6th Cir. 1990).

Fair presentment of a claim in a federal constitutional context requires a petitioner to apprise the state courts that a claim is a federal claim, "not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A petitioner need not cite "book and verse on the federal constitution," *Picard*, 404 U.S. at 278, to apprise state courts that his claim is based on federal law:

> In determining whether a petitioner has fairly presented a federal constitutional claim to the state courts, a habeas court may consider whether (1) the petitioner phrased the federal claim in terms of the pertinent constitutional law or in terms sufficiently particular to allege a denial of the specific constitutional right in question; (2) the petitioner relied upon federal cases employing the constitutional analysis in question; (3) the petitioner relied upon state cases employing the federal constitutional analysis in question; or (4) the petitioner alleged facts well within the mainstream of the pertinent constitutional law.

*Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004); *see also Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987) (quoting *Daye v. Attorney Gen.*, 696 F.2d 186, 193-94 (2d Cir. 1982)).

Stedman has exhausted direct appeals for all his claims.  Because Stedman has no remaining state remedies available, his claims have been exhausted.

D.    *Procedural default*

Reasons of federalism and comity generally bar federal habeas corpus review of "contentions of federal law . . .  not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  When a petitioner

14

has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

If the state argues that a petitioner has procedurally defaulted, the court must conduct a four-step analysis to determine whether the petitioner has indeed defaulted and, if so, whether the procedural default may be excused:

First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction.  . . . Third, the court must decide whether the state procedural forfeiture is an  "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. . . . This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims. . . . [Fourth, if] the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  A default will also be excused if petitioner demonstrates that not excusing the default "will result in a fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.

Respondent contends that Stedman has procedurally defaulted part of his third ground for relief, prosecutorial misconduct for failure to disclose potentially exculpatory evidence, and his entire fifth ground for relief, prosecutorial misconduct for asking the jury for a conviction based on matters outside the evidence.  The potentially exculpatory evidence, tests of two handguns demonstrating that the guns which were once in Stedman's possession were not the murder weapon, was revealed upon cross-examination

15

of one of the state's witnesses.  Stedman did not timely object to the prosecutor's failure to reveal the results of these tests prior to trial, nor did he present this claim to any Ohio court.  Similarly, Stedman did not timely object to the allegedly improper remarks by the prosecutor to the jury, and the state appellate court reviewing Stedman's appeal noted his failure to object at trial.  *Stedman*, 2001 WL 1398469 at *6.

"[I]n *Engle v. Isaac,* 456 U.S. 107, 124-29, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), the Supreme Court specifically found that default imposed for failure to object contemporaneously as required by Ohio's Rule 30 is an adequate and independent state ground to bar federal habeas review absent a showing of cause and prejudice."  *Scott v. Mitchell*, 209 F.3d 854, 867 (6th Cir. 2000).  Thus, Stedman has defaulted these claims.

Stedman does not contend that he had cause for his failure properly to present these claims to the state courts, nor does he show that he was prejudiced by that failure. Stedman does argue in his traverse, however, that not excusing the defaults will result in a fundamental miscarriage of justice.  Specifically, Stedman contends that he is actually innocent of the murder of which he was convicted.

Stedman did not contend that he was actually innocent in his petition.  He first raised this contention on March 8, 2006 in his motion for a permanent stay of the proceedings (Docket #17).  The court denied Stedman's motion to stay the proceedings and adopted the magistrate's report and recommendation recommending that decision.  *See* Order, October 4, 2006 (Docket #33).  The report and recommendation recommended that the court deny Stedman's motion in part because the procedural rules governing habeas petitions did not permit the proposed amendment.  Title 28 U.S.C. § 2242 states that a habeas petition may be amended as provided by the applicable rules of civil procedure.

16

As a result, Federal Rule of Civil Procedure 15 applies to the amendment of a habeas petition.  According to Rule 15(c)(2) ("R. 15"), an amendment made after the statute of limitations period has run will relate back to the original pleading if "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading."  In this habeas case, "original pleading" refers to the original habeas petition.  The one-year statutory period began to run on January 11, 2005, 90 days after the Ohio Supreme Court dismissed Stedman's last appeal.  Since the statute of limitations expired on January 11, 2006, Stedman's petition can only be amended to add a claim or defense if it arises out of the conduct, transaction, or occurrences set forth in the original habeas petition.  As was pointed out in the court's order, Stedman's contention that he is actually innocent of the crime of which he was convicted did not arise out of the conduct, transaction, or occurrences set forth in his original petition.  Stedman was not permitted, therefore, to amend his habeas petition to include actual innocence as a separate claim for relief.

Stedman currently asserts actual innocence not as a separate claim for relief but to avoid procedural default.  A claim of innocence cannot, by itself, serve as grounds for habeas relief.  Rather, a sufficient showing of innocence allows a court to exercise its equitable discretion and examine the merits of claims that would otherwise be dismissed as procedurally defaulted.  *Herrera v. Collins*, 506 U.S. 390, 404 (1993).  A petitioner asking the court to excuse a procedural default on the ground of actual innocence must show that it is more likely than not that no reasonable jury would have found petitioner guilty in light of all the evidence.  *Allen v. Yukins*, 366 F.3d 396, 406 (6h Cir. 2004).

Assuming for the moment that Stedman's current assertion of actual innocence is

not a "claim or defense" within the meaning of R. 15, the evidence that Stedman provides in support of his assertion of innocence does not suffice to demonstrate that no reasonable jury would have found him guilty in light of all the evidence.  In support of his claim of actual innocence Stedman cites three documents which he argues prove that he was out of the country when Scott was murdered on February 5, 1994.  *See* Reply to Court's Order ("Pet. reply"; Docket #22), Exhs. A, B, and C. Exhibit A is a 72-hour pass authorizing Stedman to enter Tecún Umán in the Republic of Guatemala.[2]  The pass is apparently signed by Stedman and by the local representative for immigration for the Republic of Guatemala. The pass is stamped with a seal bearing the date "1 11 94" and is also stamped on another part of the pass with the unaccompanied date "02 08 94."  There is no indication on the document as to what "02 08 94" represents.

Exhibit B is a delivery receipt for ampicillin apparently signed by Stedman and the vendor.  The receipt is dated by hand, "01 15 94."

Exhibit C is a prescription on the stationary of the National Hospital of Matalacan issued to Matthew Stedman.  It is apparently signed by a physician and dated by hand, "01/24/94."  It is stamped twice, but the stamps are illegible.  Exhibit C also contains two undated receipts for transportation within Guatemala.

Even if the court assumes that these documents are genuine[3] and further assumes

---

[2]  The documents attached to Pet. reply are in Spanish.  For a translation of these documents, see the transcript obtainable with the information in the docket entry for June 8, 2006.

[3]  This is a generous assumption, given the trial testimony that Stedman was living in Thailand under the name of Duncan Allen Robert Smith, that he possessed a passport in that name, that he had been in and out of Thailand using that passport, and that he had also used the alias Darius Homad.  *See* tr. at 152-157.

18

that the "02 08 94" stamped on the 72-hour pass represents a date on which Stedman was in Guatemala, the documents fall short of showing that it is more likely than not that no reasonable jury would have found Stedman guilty in light of all the evidence.   The documents would, under these assumptions, demonstrate that Stedman was in Guatemala on January 24, 1994 and on February 8, 1994.  A reasonable jury could still conclude that Stedman was in Cleveland on February 5, 1994, the day that Scott was murdered.

Moreover, even if the evidence were sufficient to allow the court to find that no reasonable jury could have found Stedman guilty, this would only permit the court to examine the merits of his defaulted claims.  This would not avail Stedman because the court cannot grant Stedman relief on the basis of these claims.

1.    *Failure to disclose the results of tests of weapons*

In his third ground for relief Stedman argues in part as follows:

The Petitioner was involved in legal gun sales prior to his charge in the present case.  The state and its investigators confiscated numerous weapons that were sold to individuals by the Petitioner.  These weapons were tested and found not to match the weapon used in the murder.  The state did not provide this information to the Petitioner for the preparation of trial.

Petition at ¶26.  Respondent argues that any failure to disclose the results of tests of weapons was not a violation of due process because the prosecutor was not constitutionally required to disclose that information.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ."  *Brady v. Maryland*, 373 U.S. 83, 87  (1963).  *Brady* requires disclosure only of evidence that is both favorable to the accused and "material either to guilt or to punishment."  *Id.*; *see also Moore v. Illinois*, 408 U.S. 786, 794-795 (1972).  Under the

19

*Brady* rule, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  Thus to establish a Brady violation a petitioner must demonstrate that (1) the prosecutor failed to disclose the evidence, (2) the evidence was favorable to the defense, and (3) there is a reasonable probability that had the evidence been disclosed the result of the proceeding would have been different.

At trial Detective Gary Garisek ("Garisek") testified that the police obtained weapons Stedman had sold to Dale Baxter and Nemeth.  According to Garisek's testimony, the police tested bullets from two .357 revolvers obtained from these individuals and found that they did not match the bullet taken from Scott.  Tr. at 359-60, 366-67, 369-70.

Stedman cannot argue that had the jury heard these facts the outcome would have been different because the jury *did* hear these facts and, nevertheless, convicted him. Stedman does not demonstrate that had he known earlier of the tests conducted by the police he would have been able to uncover additional facts that would have changed the outcome of the trial.  In short, Stedman does not show that there is a reasonable probability that had the evidence been disclosed earlier the result of the proceeding would have been different.  Absent such a showing there can be no *Brady* violation.  For this reason, Stedman's argument that the failure to disclose earlier the results of the tests of weapons sold by Stedman violated his right to due process is not well taken.

### 2.     *Prosecutorial misconduct in closing arguments*

Stedman argues in his fifth ground for relief that he was denied due process

because the prosecutor improperly alluded to matters outside the evidence in urging the

jury to conviction.  In his closing remarks, the prosecutor addressed the jury in relevant part

as follows:

> Ladies and gentlemen, hone in on what the evidence is.  If you want to talk about, you know, different people, things like that, we could talk about it after this trial, but we submit to you that what we have presented to you is sufficient and we could explain to you later why every single person that may have heard about this was not called as a witness.

Transcript of Proceedings ("Tr."; Docket #16), pp. 457-458.

"The touchstone of due process analysis in cases of alleged prosecutorial

misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,*

455 U.S. 209, 219 (1982).  The aim of due process "is not punishment of society for the

misdeeds of the prosecutor but avoidance of an unfair trial to the accused." *Id.* (citations

omitted).  To obtain habeas relief a petitioner must show that prosecutorial misconduct was

sufficiently egregious that it "so infected the trial with unfairness as to make the resulting

conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986)

(quoting *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974)); *see also United States v. Young,*

470 U.S. 1, 11-12 (1985) (holding that habeas relief may be granted only if the prosecutor's

conduct was so egregious as to render the petitioner's trial fundamentally unfair).  This

determination must be made by considering the totality of the circumstances of each case.

*See Byrd v. Collins,* 209 F.3d 486, 529-30 (6th Cir. 2000).     Prosecutorial misconduct is

subject to harmless error analysis.  *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir. 1997).

On federal habeas review, a petitioner must show that a trial error "had substantial and

injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507

U.S. 619, 637 (1993).  Four factors should be considered in weighing the extent of any

21

prosecutorial misconduct:

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive;  whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Pritchett*, 117 F.3d at 964 (quoting  *Serra v. Michigan Dep't of Corr.,* 4 F.3d 1348, 1355-56

(6th Cir. 1993)).

The state appellate court reviewing Stedman's conviction made the following

relevant findings regarding this claim:

> A prosecutor should be afforded certain latitude and freedom of expression during closing argument.  *State v. Apanovitch* (1987), 33 Ohio St. 3d 19. The court further instructed in *Apanovitch* that a prosecuting attorney's conduct during trial does not constitute a ground for error unless the conduct deprives the defendant of a fair trial. To determine whether reversal is justified, the court must view the prosecutorial misconduct in light of the entire case.  *State v. Maurer* (1988), 38 Ohio St. 3d 275.
>
> Here, the record shows that defense counsel did not raise any objections to the remark by the prosecutor.  Stedman therefore waived his right to challenge it on appeal.  Even if he had preserved this claim, the record reveals that Potasiewicz testified that Stedman told many people about Stedman's involvement in the murder. Furthermore, Ciobotaru testified that he heard as many as thirty people at work talking about Stedman's involvement. In his closing argument, defense counsel commented that no one other than Ciobotaru, Starr, and Potasiewicz appeared in court to testify despite the fact that many others supposedly knew of Stedman's involvement. We think that the prosecutor properly alluded to others who also knew of Stedman's involvement and properly implored the jury to consider the presentation of state's witnesses as sufficient to prove Stedman's guilt beyond a reasonable doubt.  These comments emanated from evidence properly admitted into evidence during trial and had been made in response to defense counsel's remark at closing.  Therefore, we believe that the prosecutor's comments had been within the latitude afforded by the law.  Viewing the case in its entirety, including the eyewitness testimony of Potasiewicz and Stedman's change of identity and residence in Thailand, these comments made by the prosecutor in final argument did not deprive Stedman of a fair trial or rise to the level of prosecutorial misconduct justifying a reversal.

*Stedman*, 2001 WL 1398469, at *6.

The state court found, therefore, that there was no prosecutorial misconduct and that

22

the prosecutor's statements did not deprive Stedman of a fair trial.  Even if this court assumes that the prosecutor's remarks were improper, given that the remarks had a relatively minor tendency to mislead the jury and they were an isolated incident, it is impossible to conclude that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181.  Stedman's arguments to the contrary are not well-taken.

In sum, Stedman procedurally defaulted that portion of his third ground for relief which asserts that he was denied due process when the prosecutor failed to disclose the results of certain weapons tests before trial and defaulted his fifth ground for relief, a denial of due process because the prosecutor alluded to matters outside the evidence in urging a conviction.  Stedman fails to make a sufficient showing of innocence to justify the court's ignoring his procedural defaults and going to the merits of these claims.  Even if he did make a sufficient showing of innocence, however, it would not avail him because he would be unable to obtain habeas relief on the basis of these claims.  For these reasons, the magistrate judge recommends that the court dismiss part of Stedman's third ground for relief and his entire fifth ground for relief as procedurally defaulted.

III

The Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") altered the standard of review that a federal court must apply when deciding whether to grant a writ of habeas corpus.  As amended, 28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

23

of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under the current deferential standard of review, a writ of habeas corpus may issue only if the state court's decision is contrary to clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence. *Williams v. Taylor*, 529 U.S. 362, 379-90 (2000); *Miller v. Francis*, 269 F.3d 609, 613-14 (6th Cir. 2001). Law is "clearly established" only by holdings of the Supreme Court, not its dicta, and the law must be clearly established at the time of the petitioner's conviction. *Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Courts must give independent meaning to the phrases "contrary to" and "unreasonable application of" in § 2254(d)(1):

Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to* ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of* ... clearly established Federal law, as determined by the Supreme Court of the United States."

*Williams*, 529 U.S. at 405 (emphasis added by the quoting court). A decision is "contrary to" clearly established federal law if it reaches a conclusion opposite to that reached by Supreme Court holdings on a question of law or if it faces a set of facts materially indistinguishable from relevant Supreme Court precedent and still arrives at an opposite result. *Id.* "A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Id.* A decision involves an unreasonable application of federal law only if the deciding court correctly identifies the legal principle at issue and unreasonably applies it to

24

the facts of the case at hand.  *Doan v. Brigano*, 237 F.3d 722, 729-31 (2001).  If a court fails to identify the correct legal principal at issue, the "unreasonable application of" clause does not apply.  *Id.* at 730.

 "[A] determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  The petitioner, however, may rebut "the presumption of correctness by clear and convincing evidence."  *Id.*  The magistrate judge will consider Stedman's remaining claims under the deferential standard of review accorded the state court's determination of a prisoner's constitutional claims.

A.      *Ground one:  The trial court erred by overruling Stedman's objection to a hearsay statement elicited to corroborate testimony of a key prosecution witness*

Stedman argues in his first ground for relief that the trial court erred by allowing Andrew Starr ("Starr") to testify that he had discussed with George Ciobotaru ("Ciobotaru" or "George C") what had happened the night of the killing and that Ciobotaru's version of what had happened was consistent with what Stedman had told Starr about what had happened.  Respondent denies that Starr's testimony was hearsay because Starr's testimony did not include a statement made by Ciobotaru and the testimony was not offered to prove the truth of the matter asserted.  Respondent also argues that, in any case, as Ciobotaru was available at trial for cross-examination, there was no violation of the confrontation clause.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Confrontation Clause secures defendants an adequate opportunity to cross-examine adverse witnesses.   See, *e.g., Mattox v. United*

25

*States,* 156 U.S. 237, 242-243 (1895); *Douglas v. Alabama,* 380 U.S. 415, 418 (1965).  The

clause was enacted to ensure that a defendant had the opportunity to test a declarant's

testimony before a jury:

> The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Mattox v. United States*, 156 U.S. 237, 242-243 (1895).  The Confrontation Clause does

not guarantee a "cross-examination that is effective in whatever way, and to whatever

extent, the defense might wish.'"  *Kentucky v. Stincer,* 482 U.S. 730, 739 (1987).

The Confrontation Clause limits in two ways the types of hearsay which may be

admitted at trial:

> First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity.  In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.
>
> The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that "there is no material departure from the reason of the general rule."  The principle recently was formulated in *Mancusi v. Stubbs* :
>
> "The focus of the Court's concern has been to insure that there 'are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant,' and to 'afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement,'  It is clear from these statements, and from numerous prior decisions of this Court, that even though the witness be unavailable his prior testimony must bear some of these 'indicia of reliability.'"

26

*Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980) (citations and footnote omitted).

The admission of hearsay in violation of the Confrontation Clause is subject to harmless error analysis.  "For purposes of federal habeas corpus review, a constitutional error that implicates trial procedures is considered harmless unless it had a 'substantial and injurious effect or influence in determining the jury's verdict.'"  *Calvert v. Wilson*, 288 F.3d 823 (6th Cir. 2002) (citing *Brecht v. Abrahamson,* 507 U.S. 619 (1993)).

In relevant part, Starr testified as follows:

Q.    Did you ever talk to George C about it?

A.    Yes.

Q.    And after your conversations with George C, were you able to learn whether or not George C knew about this?

A.    Yes.

Q.    You did?

A.    Yes.

Q.    And did George C's story about what happened, was it consistent with what the defendant had told you?

            MR. BRADLEY:      Objection.

A.    Yes.

            THE COURT:      Overruled.

Q.    Your answer is?

A.    Yes.

Q.    Did George C indicate to you that anyone other than the defendant was the person who shot the prostitute?

            MR. BRADLEY:      Objection.

27

THE COURT:         Overruled.

A.     No, he did not.

Q.     So, the only person that you ever heard shot this woman was the defendant?

A.     Correct.

Tr. at 101-02.

The fourth witness for the state after Starr testified was Ciobotaru.  Ciobotaru testified that law enforcement officers police came to his home in 1996 asking about Stedman's involvement in the killing of Scott and that he "told them what they wanted to hear to get them off my back."  Tr. at 190.  At that point, the judge excused the jury, spoke with counsel, then addressed the court as follows:

> Prosecutor Michael Horn, prior to calling this witness, approached the sidebar and indicated that, in fact, he may have a situation where Mr. Ceiobotaru [sic] refuses to testify or changes his previously given statement to the police officers.
> Mr. Horn asked if it would be appropriate for the Court to call him as a Court's witness, and we discussed this at sidebar with all counsel present.  I made a determination at that time that I would ask the State of Ohio to call this witness and then I will permit the State of Ohio to request in front of the jury that they be permitted to cross-examine him as a hostile witness if he backed off his statement.  It's obvious to me now that Mr. Ceiobotaru [sic] is headed in that direction.
> But, Mr. Ceiobotaru [sic], I have cleared this courtroom from the jury to issue a very clear warning to you, sir.  You must testify in this case.  You have been subpoenaed, you have been sworn, and you have testified.  You have waived any privilege at this point not to testify.  You are not a subject of this proceeding, you do not face jeopardy, and therefore you may not invoke your Fifth Amendment rights.
> I want to further advise you that your testimony is being transcribed by the court reporter.  If I conclude that you have made a statement that is inconsistent with your former statement – I should say if you make a statement that is inconsistent with your former statement, I'm going to order a copy of this transcript immediately transcribed, provided to myself, the prosecution and the defense, and I'm going to have my staff attorney personally walk it to the assistant county prosecutor – I should say county prosecutor, William Mason.
> Now, if you think that this is an idol [sic] threat, I want you to be aware of the fact that the first person convicted in Cuyahoga County was convicted as a result of perjury that occurred in my courtroom and that person was sentenced to prison and served a term of incarceration.

28

I'm going to give you a few moments to reflect on what I just said.  You will remain in the courtroom under the supervision of the deputy that's present.

Tr. at 190-92.  The judge then called back the jury.

Under direct examination, Ciobotaru admitted that when a policeman and an F.B.I. agent came to his house he told them that Stedman had told him that he and Potasiewicz had been in a bar in the flats when Potasiewicz  told Stedman, "Let's go kill someone." Ciobotaru then told the officials that Stedman and Potasiewicz drove to the area around the Cleveland Clinic and that Stedman shot Scott when she bent down to the car window. Ciobotaru also told the police that Stedman had taken him to the spot where the murder occurred.  When the state asked Ciobotaru whether, in fact, Stedman had told him those things, Ciobotaru said, "I don't personally recall."  Tr. at 194.  The state then moved to have Ciobotaru declared a hostile witness, and the court granted the motion.

Under further questioning, Ciobotaru testified that he told the law enforcement officers that Stedman had told him about the murder because he was on parole and they had threatened him with revocation of his parole if he did not cooperate. According to Ciobotaru, for that reason and because he thought that Stedman was out of the country and would not return, he told the officers what he thought they wanted to hear to get rid of them.  Ciobotaru also testified that Stedman had worked at the place where Ciobotaru was working at the time, Micro Experts, and that everyone at work knew about Stedman's involvement in the murder of a prostitute.  Ciobotaru testified that he got his information about the murder from Potasiewicz, who also worked at Micro Experts, from others at work, and from Starr, and that all his sources of the story agreed that Stedman had shot the prostitute.  Ciobotaru stated that he could not remember whether he learned anything about

29

the murder from Stedman.  Ciobotaru maintained this testimony through cross-examination, re-direct examination, re-cross examination, and further re-direct examination.

Respondent's contentions that Starr's testimony was not hearsay because Starr's testimony did not include a statement made by Ciobotaru and the testimony was not offered to prove the truth of the matter asserted are not well-taken.  There is no requirement that a description of what a third party said is hearsay only if the description is a verbatim or near-verbatim report of what the third party said.  Starr testified regarding the substance of what Ciobotaru told him, *i.e.* that what Ciobotaru told him was consistent with what Stedman told him regarding Scott's murder.  As that testimony was testimony about the content of a third party's statement, it was hearsay.  Similarly, respondent's assertion that Starr's testimony that Ciobotaru's statements to Starr about the murder were consistent with Stedman's were not offered for the truth of Ciobotaru's statements is also not well-taken.  The state was seeking to prove that Stedman killed Scott.  After the state obtained Starr's testimony that Ciobotaru's and Stedman's stories to Starr were consistent, the only question the state asked about how, specifically, the stories were consistent was "Did George C indicate to you that anyone other than the defendant was the person who shot the prostitute?"  To argue that Starr's testimony about what Ciobotaru said about the murder of Scott was not offered for the truth of what Ciobotaru said is, under these circumstances, disingenuous.

Respondent's contention that there was no constitutional violation because Stedman had an opportunity to cross-examine Ciobotaru, however, is well-taken.  There can be no constitutional violation if the defendant had the opportunity to cross-examine the declarant. *California v. Green*, 399 U.S. 149, 158 (1970) (holding that "the Confrontation Clause is not

30

violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination.").

Moreover, even if admitting Starr's testimony about what Ciobotaru told him were a constitutional violation, it would be impossible to find that the admission of that testimony had a substantial and injurious effect on the jury's verdict.  Ciobotaru testified that (1) he lied when he told law enforcement officers that Stedman was the source of his information about the killing of Scott and (2) the only reasons he said that Stedman was the source of his information was because the officers coerced him and because he did not think Stedman would return to the United States.  The defense contended that Potasiewicz implicated Stedman because if he had not, Potasiewicz would have been accused of having committed the murder himself.  Tr. at 20-25, 419-29.  Thus, under the defense's theory of the case, Ciobotaru's knowledge of the crime was not credible because it came either from second or third-hand sources or from a source with a motive to lie about Stedman's involvement in the crime.[4]  Ciobotaru's testimony was entirely supportive of this theory.  A witness who disclaims his statement to the police implicating the defendant and admits that any knowledge he has of the crime come from sources that have no first hand knowledge of the crime or from sources that have a motive to lie can hardly be said to have had a substantial and injurious impact on the jury's decision to find the defendant guilty.

For the above reasons the magistrate judge recommends that the court overrule Stedman's first ground for relief.

B.    *Whether the court's admonition of Ciobotaru violated Stedman's right to due process*

_____

[4]  The defense also suggested that Ciobotaru himself might have been involved in the crime.  *See*  tr. at 419-30.

31

Stedman alleges that the court's admonitions to Ciobotaru that he risked prosecution for perjury if he contradicted his prior statement to law enforcement officers and that Ciobotaru had waived his right not to testify violated Stedman's right to due process[5] in two ways: (1) it improperly coerced Ciobotaru to testify in accordance with his prior testimony even if that testimony were false, and (2) it invaded the province of the jury by improperly prejudicing the jury against any statement from Ciobotaru that contradicted his former testimony.

Errors in the application of state law are not grounds for habeas relief unless the violation of the state's law or rule results in the denial of fundamental fairness, thereby violating due process. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir. 1983) (citations omitted). "[A] fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." *Strickland v. Washington*, 466 U.S. 668, 685 (1984).

The court need not decide whether the court's admonition of Ciobotaru improperly coerced Ciobotaru because it was ineffective in that regard. Despite the court's warning that Ciobotaru would be prosecuted for perjury if his testimony differed from his statement

---

[5] Stedman does not specifically allege a due process violation. Rather, he alleges that the conduct of the judge violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. The magistrate judge cannot determine how rights protected by the Eighth Amendment might have been violated by the judge's conduct, and Stedman does not explain this. The court supposes that Stedman alleges a violation of rights protected by the Sixth Amendment on the ground that the judge's admonition denied Stedman the right to an impartial jury. If that is what Stedman is arguing, then Stedman is objecting to the alleged tainting of the jury due to improper trial procedure. An alleged constitutional violation based upon improper procedure is more properly examined as a due process violation.

to the police, Ciobotaru renounced his previous statement and testified that he had identified Stedman as the source of his knowledge of the murder of Scott only because he had been coerced to do so by law enforcement officers.  As the court's admonition did not, apparently, affect the presentation of evidence against Stedman, it cannot be said that it rendered the trial fundamentally unfair in that respect.

Similarly, the judge's admonition did not render the trial fundamentally unfair by prejudicing the jury.  As Stedman notes, most of the judge's remarks took place out of the hearing of the jury.  As can be seen on pages 28-29 *supra*, the jury was out of the courtroom when the court gave its admonition to Ciobotaru.  As regards any remarks that the judge might have made in the presence of the jury, Stedman does not cite as improper the content of any remarks made by the court.  Rather, Stedman states, "[I]t is impossible to note from the record the change in the witnesses [sic] tone, delivery, facial expressions and demeanor after a threat from the judge.  It is also impossible to glean from the record the judge's demeanor in regards to this witness."  Petition (Docket #1) at ¶19.  While this may be true, the burden is nevertheless on Stedman to prove a violation of his rights; the burden is not on respondent to prove no violation occurred.  Stedman has not carried his burden.  Stedman's claim, therefore, that the court invaded the province of the jury by improperly prejudicing the jury against any statement from Ciobotaru contradicting his former testimony is not well taken.

For these reasons the magistrate judge recommends that the court overrule Stedman's second ground for relief.

C.      *Whether allowing Nemeth to testify violated Stedman's constitutional rights*[6]

Stedman argues that allowing Nemeth to testify that he, Ciobotaru, and Stedman went drinking in the Flats and afterward drove to the area of East 40th Street and Cedar Avenue to harass prostitutes erroneously admitted prejudicial evidence against him. Respondent denies that allowing Nemeth to testify violated Stedman's constitutional rights.

Stedman argues that court erred in allowing Nemeth to testify at trial because Nemeth had not been on the state's witness list prior to trial and because admission of Nemeth's testimony prejudicially allowed the jury to conclude that the murder of Scott was in conformity with his character. Because this alleged error involves the application of state law, the proper test is whether the alleged violation resulted in the denial of fundamental fairness.

The state appellate court reviewing Stedman's conviction made the following findings of fact and law in considering this ground for relief:

> [T]he state called Robert Nemeth, who testified that, in 1993 and 1994, he, Ciobotaru, and Stedman would go out drinking in the Flats[7] and afterwards would

---

[6] Again, Stedman is vague regarding which rights were violated by allowing Nemeth to testify, asserting only that this violated his rights protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments. As Stedman is alleging an erroneous evidentiary ruling, the claim should be regarding as alleging a due process violation.

[7] Nemeth was equivocal regarding how often he, Ciobotaru, and Stedman went together to the Flats and then to the area of East 40th and Cedar to harass prostitutes. At times, Nemeth spoke as though this had been a regular occurrence. Tr. at 347-49. When pressed by the prosecutor to specify more clearly who regularly went with him to harass prostitutes, Nemeth responded, "Mostly with George Ceiobotaru [sic]. Most of the time the two of us. There was at least one occasion where Matt Stedman did come with us." Tr. at 349.

Stedman asserts that the state appellate court's factual findings regarding this claim for relief should not be entitled to a presumption of correctness because the state court improperly concluded that the evidence demonstrated that Stedman harassed prostitutes

34

drive around the area of East 40th and Cedar Avenue to harass prostitutes.  He testified that, in that area, if you stopped a car, a prostitute would approach you; he also testified that they harassed prostitutes by driving away as they approached.

*     *     *     *     *

Stedman objects to the state's calling Robert Nemeth as a witness because he had not been listed on the state's witness list.  He also objects to Nemeth's testimony as inadmissable other acts evidence offered by the state to show his propensity to the crime charged in violation of Evid. R. 404(B).

Regarding the first issue of whether the court erred in allowing Nemeth to testify despite the prosecutor's alleged violation of Crim. R. 16, we note that Crim. R. 16(E)(3) provides for the regulation of discovery in a criminal case and permits a trial court to exercise discretion in determining the appropriate sanction for a discovery violation. See *State v. Scudder* (1994), 71 Ohio St.3d 263.  In *Scudder,* the court set forth the following test:

> * * * [W]here a prosecutor violates Crim. R. 16 by failing to provide the name of a witness, a trial court does not abuse its discretion in allowing the witness to testify where the record fails to disclose (1) a willful violation of the rule, (2) that foreknowledge would have benefitted the accused in the preparation of his or her defense, or (3) that the accused was unfairly prejudiced.

Here, the record indicates that after the trial had begun on September 29, 1999, the prosecutor discovered Nemeth on October 1, 1999, and, on that day, faxed Nemeth's name to Stedman's defense counsel, who somehow never received the fax.

The record does not clearly indicate that the prosecutor failed to comply with Crim. R. 16.  First, although a more diligent review of the police file would have helped the prosecutor uncover the existence of Nemeth, the prosecutor relayed the information regarding Nemeth to defense counsel on the same day of the discovery of this witness.  Therefore, we do not conclude that the state *willfully* violated Crim. R. 16. See *Scudder, supra,* at 269 (no willfulness exists where the evidence shows that the state is merely negligent in its investigation).  Second, defense counsel had an opportunity to interview Nemeth before his direct testimony at trial; on cross-examination, defense counsel successfully elicited from Nemeth the fact that

---

on a regular basis.  As can be seen in that court's opinion, *see* the last full paragraph *infra*, p. 36, the state appellate court was aware that Nemeth had said that Stedman had joined him "at least once" and noted that in its opinion.  This court will, therefore, accord the appellate court's factual findings regarding this claim the deference required by 28 U.S.C. § 2254(e)(1).

his brother worked with Potasiewicz, thus exposing a potential bias of Nemeth toward Potasiewicz, a potential suspect for the murder. Therefore, Stedman did not show either that the foreknowledge would have aided him in preparation of his case had he learned about the state's intention to call Nemeth sooner, or that the belated notice unfairly prejudiced him. Applying the tripartite test set forth in *Scudder,* then, we have concluded that the court did not abuse its discretion in permitting Nemeth to testify.

Stedman in addition challenges Nemeth's testimony as impermissible character evidence presented to show his propensity toward criminal conduct.

Evid. R. 404 provides, in pertinent part:

> Rule 404. Character Evidence Not Admissible to Prove Conduct; Exceptions; Other Crimes
>
> (B) Other Crimes, wrongs or acts. Evidence or other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In *State v. Lowe* (1994), 69 Ohio St.3d 527, the court set forth the standard for the admissibility of other-act evidence:

> Other acts may also prove identity by establishing a modus operandi applicable to the crime with which a defendant is charged. "Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid. R. 404(B)." (Citation omitted.) " * * * A certain modus operandi is admissible not because it labels a defendant as a criminal, but because it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator. * * * To be admissible to prove identity through a certain modus operandi, other-acts evidence must be related to and share common features with the crime in question.

In the instant case, Nemeth testified that he, Ciobotaru, and Stedman, on at least one occasion between 1993 and 1994, drove around the area of East 40th and Cedar and harassed prostitutes; he also testified that in that area if you stopped a car, a prostitute would approach you. In our view, Nemeth's testimony is admissible to prove Stedman's knowledge or familiarity of *where, when,* and *how* the prostitutes practiced their trade on Cleveland's east side.

Moreover, this other act evidence is also admissible to prove identity by establishing a modus operandi applicable to the crime. The evidence established a "behavioral

36

fingerprint" linking Stedman to the crime due to the common features shared on both occasions: after drinking at the bar, he drove around, late at night, in a certain area frequented by prostitutes for the purpose of harassing them.  His prior activity and the instant offense demonstrate a similar method of operation and thereby help to establish identity.

Therefore, in our view, Nemeth's testimony proves both knowledge and identity, as permitted pursuant to Evid. R. 404(B). We therefore overrule this assignment of error.

*Stedman*, 2001 WL 1398469 at *2, *3-*4.

Stedman does not show by clear and convincing evidence that the state appellate court's factual findings were erroneous, nor does he cite any law to demonstrate that the court's legal conclusions were wrong.  Finally, Stedman cites no holding of the United States Supreme Court which would support his contention that admitting Nemeth's testimony violated his right to due process or any other constitutionally-protected right.  Because Stedman has failed to assume his burden of proof as regards this ground for relief, the magistrate judge recommends that the court overrule Stedman's third ground for relief as it relates to the testimony of Nemeth.

D.    *Ineffective assistance of counsel for failure timely to object to a "flight" instruction*

Stedman contends that he was denied the effective assistance of counsel when counsel failed timely to object to the court's instruction to the jury.  Respondent denies that counsel was ineffective for failing to object.

The standard for determining whether petitioner's counsel was ineffective is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Groseclose v. Bell*, 130 F.3d 1161, 1167 (6th Cir. 1997).  A claim of ineffective assistance of counsel has two components:

37

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687; *see also Groseclose*, 130 F.3d at 1167.

The first prong of this test, the showing of deficient performance, is an objective one: "[T]he proper standard for attorney performance is that of reasonably effective assistance. . . . When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness," as judged by "prevailing professional norms." *Strickland*, 466 U.S. 687-88; *see also Groseclose*, 130 F.3d at 1167.  Scrutiny of counsel's performance is highly deferential to avoid second-guessing an adverse decision.  *Strickland*, 466 U.S. at 689; *see also Groseclose*, 130 F.3d at 1167.  The petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Groseclose*, 130 F.3d at 1167.  A court reviewing counsel's performance "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." *Id.* at 690-91 (1984); *see also Groseclose*, 130 F.3d at 1167-6.

The second prong of the test for ineffective assistance of counsel is whether the

38

error prejudiced petitioner:

> An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.

*Strickland*, 466 U.S. at 690-91 (citations omitted); *see also Groseclose*, 130 F.3d at 1168.

Further "the burden rests on the accused to demonstrate a constitutional violation." *United States v. Cronic*, 466 U.S. 648, 658 (1984). Showing a constitutional violation requires showing that "counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Nix v. Whiteside*, 475 U.S. 157, 175 (1986). "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). A reviewing court must ask itself "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695; *see also Groseclose*, 130 F.3d at 1168.

The state appellate court reviewing Stedman's appeal made the following findings of fact and law[8] in examining this ground for relief:

---

[8] Stedman argues that the state appellate court's findings should not be accorded deference. He points out that the court responded in part to a motion to exclude flight testimony by saying, "I don't know how we could possibly at this point limit that testimony." Tr. at 132. Stedman interprets this to mean that the judge mistakenly believed that he did not have discretion to limit such testimony. Traverse at 32. He further argues that because the state appellate court was mistaken in finding that the trial court had properly allowed the admission of flight testimony, rather than making no ruling because it believed it could not rule in the matter, this court should not accord the state appellate court's factual

Stedman challenges the admissibility of the evidence regarding his arrest in Thailand and the use of an alias while there . . . The state asserts that the court properly admitted the evidence.

Considering first the evidence of Stedman's flight from justice, we note that "the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *State v. Williams* (1997), 79 Ohio St.3d 1, 11.

In the instant case, Stedman's trial counsel argued that he left the country in June 1995 when the ATF agents sought him for unspecified weapon charges. The state, on the other hand, argued that Stedman fled the country because he feared that the police might learn about his involvement in Scott's murder if they arrested him in connection with the arson charge.

Given this state of the record, we do not think that the court erred in admitting the evidence and allowing the parties to present and argue competing inferences to be drawn from Stedman's flight from justice, one such inference being that he fled the country because of his consciousness of guilt of Scott's murder.

*         *         *         *         *

To sustain a position that his counsel had been ineffective, Stedman must demonstrate both deficient performance and that, but for such conduct, the outcome of the trial would have been different. See *Stickland v. Washington* (1984), 466 U.S. 668; *State v. Bradley* (1989), 42 Ohio St.3d 136.

On the basis of our review regarding the admissibility of the challenged evidence, we conclude that the record before us does not indicate ineffective assistance of counsel.

*Stedman*, 2001 WL 1398469, at *5, *6.

---

findings deference. This interpretation is strained and unconvincing. Prior to making the quoted remark, the trial court observed that the defense in its opening statement had referred to Stedman's flight and contended that the flight was related to a weapons charge. The court's remark merely pointed out that because the defense itself had introduced the issue, it could not now argue that evidence regarding that issue should be excluded. Moreover, the court explicitly overruled the defense's objection to the admission of testimony regarding Stedman's flight. Tr. at 134. Stedman's argument is not well-taken, and the court will accord the state appellate court's factual findings on this issue the deference required by 28 U.S.C. § 2254(e)(1).

40

Stedman does not show by clear and convincing evidence that any of the state appellate court's factual findings were erroneous.  Stedman also fails to cite any holding of the United States Supreme Court which would support his contention that failing to object to the "flight" instruction to the jury constituted ineffective assistance of counsel.  Because Stedman has not carried his burden of proof as regards this ground for relief, the magistrate judge recommends that the court overrule Stedman's fourth ground for relief, ineffective assistance of counsel for failing to object to the court's "flight" instruction to the jury.

E.    *Ineffective assistance of counsel for failing to investigate*[9]

Stedman argues that his trial counsel was ineffective for failing to investigate the scientific aspects of the testimony of Potasiewicz.  Specifically, Stedman makes the following argument:

> 46)    Counsel failed to prepare for trial by making a reasonable investigation of the police statement made by the state's star witness, James Potasiewicz.  Potasiewicz alleged that while a passenger in Petitioner's vehicle, Petitioner held a large caliber revolver as long barreled, [sic] probably a .357 magnum.  He also gave information as to [a] specific type of ammunition used.  However, at trial, the state was unable to substantiate Potasiewicz's claim of events with physical evidence.
>
> 47)    Defense counsel had no knowledge of, or background in forensic ballistics, which was a key element of the state's case.  As a result, counsel was unable to ask

_____

[9] Respondent reads Stedman's sixth ground for relief as presenting two claims of ineffective assistance of counsel:  one for failing generally to investigate the facts presented in Potasiewicz's testimony and one for failing to investigate the scientific evidence presented in that testimony.  Respondent argues that the first claim, failure generally to investigate the facts alleged by Potasiewicz, has been procedurally defaulted.  The court reads Stedman's sixth ground for relief as presenting a single ground for relief, failing to investigate the scientific evidence presented in Potasiewicz's testimony.  Respondent is correct, however, in arguing that if Stedman intended to present two claims in his sixth ground for relief, a claim that counsel was ineffective for failing generally to investigate the facts alleged by Potasiewicz is procedurally defaulted for the reasons described in the Answer at 38-39.

relevant scientific questions, or in general, effectively cross-examine the state's witnesses.  Likewise, counsel was unable to support the defense's claims or theories.  The state in summation, even told the jury that there was no proof presented to substantiate counsel's claims, he "just made them up".  Counsel's failure to prepare by consulting with and presenting a forensic ballistic expert had a detrimental affect [sic] on Petitioner, as not only was counsel's credibility diminished, but defense's theories were left unproven.

*     *     *     *     *

[C]ounsel's failure to investigate the scientific aspects of this witness's claims was by any standard unreasonable, as the tale of events was for the most part, if not entirely, impossible.  A forensic ballistic expert would have refuted Potasiewicz's claims.  Ergo, counsel's negligence severely prejudiced the Petitioner, and resulted in a wrongful conviction . . . .

Petition at ¶¶46-47, 49 (punctuation in the original).

The state appellate court reviewing Stedman's appeal made the following findings

of fact and law in examining this ground for relief:

Stedman also contends that he received ineffective assistance of counsel because his trial counsel failed to employ a forensics expert, which, he believes, would have offered testimony contradicting the state's evidence that Scott had been shot at close range, thus pointing to his innocence.

Stedman's claim that the utilization of an expert would have exonerated him is speculation only, since the record does not reveal the kind of testimony an expert could have offered on his behalf.  Because Stedman cannot demonstrate prejudice from his counsel's failure to employ an expert, his claim of ineffective assistance of counsel cannot stand. This assignment of error is also overruled.

*Stedman*, 2001 WL 1398469, at *6.

Similarly, the appellate court reviewing the denial of Stedman's petition for

postconviction relief and motion for a hearing made the following findings of fact and law:

{¶ 26} In support of his claim that counsel was ineffective for not conferring with a forensics expert, Stedman appended the following evidence to his petition: 1) James Potasiewicz's police statement; 2) his own affidavit; 3) the affidavit of his parents, Daniel and Mary Ann Stedman; and 4) the affidavit of Barbi Smith, whose relationship to Stedman is not identified.

42

{¶ 27} None of this evidence, however, is sufficient to demonstrate defense counsel's ineffectiveness.  First, Patasiewicz's [sic] police statement is clearly not new evidence; it was available to Stedman at the time of trial.

{¶ 28} The affidavits are similarly deficient. Stedman's affidavit avers that defense counsel had agreed to "present a forensics expert at trial to testify about shot distance, caliber variations and scene evidence." The affidavit of Stedman's parents avers that "no forensics expert was brought in to discredit the State's witnesses and support the defense claims" and, further, that defense counsel "did nothing he claimed he would do in [Stedman's] defense," including calling a forensics expert. In her affidavit, Barbi Smith avers that defense counsel told her prior to trial that he would call a forensics expert "who would testify at trial in order to discredit the State's witnesses and support the defense's claims," but then "seemed to abandon his entire line of defense" when his father-in-law died shortly before trial.

{¶ 29} When assessing whether or not to grant a hearing, the trial court should examine the contents of the affidavits offered in support of the petition. *State v. Nelson* (Sept. 21, 2000), Cuyahoga App. No. 77094.  A trial court may discount self-serving affidavits from the petitioner or his family members.  *State v. Moore* (1994), 99 Ohio App.3d 748, 651 N.E.2d 1319.  Although a trial court should give deference to affidavits filed in support of a postconviction relief petition, it may exercise its discretion when assessing the credibility of the affidavits.  *State v. Calhoun* (1999), 86 Ohio St.3d 279, 714 N.E.2d 905, paragraph one of the syllabus.

{¶ 30} Here, one of the three affidavits is Stedman's own self-serving affidavit and another affidavit is from his parents, who are obviously "interested in the success of the petitioner's efforts."  *Calhoun,* supra at 285, 714 N.E.2d 905.  Thus, as the trial court stated in its findings of fact and conclusions of law, "petitioner's affidavit is insufficient to support his claims as it is self-serving.  The joint sworn statement from petitioner's parents constitutes evidence from interested parties that is only slightly persuasive under *Calhoun.*"

{¶ 31} Most importantly, however, none of the affidavits indicate how Stedman was prejudiced by counsel's failure to consult with a forensics expert.  Although Stedman asserted in his petition that defense counsel should have hired a forensics expert in order to effectively cross-examine the State's expert witnesses, and to testify about the type of bullet removed from the victim's body, the caliber of gun used, and the distance from which it was fired, he offered no evidence demonstrating that he was prejudiced by counsel's failure to do so.  The coroner and a detective from the Cleveland Police Department testified for the State at trial regarding these issues. The affidavits attached to Stedman's petition fail to demonstrate that their testimony was not credible and further, make no assertion that Stedman's forensic expert would have testified differently and affected the outcome of the trial.  In addition, the affidavits do not demonstrate how a forensics expert would have refuted Potasiewicz's testimony at trial that Stedman reached over and shot Scott as

43

Potasiewicz sat in the front seat of the car. Accordingly, there was no evidence to demonstrate that Stedman was prejudiced by his counsel's failure to call a forensic expert at trial.  Although Stedman's brief on appeal contains extensive argument regarding how the lack of a forensics expert prejudiced him at trial, he offered no evidence to the trial court that demonstrated such prejudice.  Without such evidence, Stedman failed to sustain his burden of demonstrating ineffective assistance of counsel.

{¶ 32} Finally, there are countless ways for an attorney to provide effective assistance in a given case and we must give great deference to counsel's performance.  *Strickland v. Washington* (1984), 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.  "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *."  *Id.*  Debatable trial tactics and strategies do not constitute a denial of effective assistance of counsel.  *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 402 N.E.2d 1189.  Within the purview of trial tactics is defense counsel's selection of witnesses to call at trial.  *State v. Coulter* (1992), 75 Ohio App.3d 219, 230, 598 N.E.2d 1324.  On this record, we cannot say that defense counsel was ineffective for not calling a forensics expert to testify at trial.

*State v. Stedman*, 2004 WL 1404124, at *4-*5 (Ohio App. June 24, 2004).

Stedman does not show by clear and convincing evidence that the state appellate courts erred in concluding that he was not prejudiced by the alleged ineffective assistance of counsel.  Absent a showing of prejudice, Stedman cannot obtain relief on his claim of ineffective assistance of counsel.  Similarly, Stedman cites no state law nor any holding of the Supreme Court to show that, *contra* the state appellate court, his trial counsel's performance fell below an objective standard of reasonableness.  For these reasons, the magistrate judge recommends that the court overrule Stedman's sixth ground for relief, ineffective assistance of counsel for failing to investigate the scientific aspects of Potasiewicz's claims.

IV

For the reasons given above the magistrate judge recommends that the court

44

overrule Stedman's motions for an evidentiary hearing and to expand the record and deny

his petition.


Date:  December 14, 2006          /s/Patricia A. Hemann
                                  Patricia A. Hemann
                                  United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).